```
 1              IN THE MAGISTRATE COURT FOR THE COUNTY OF COBB
 2                              STATE OF GEORGIA
 3
 4
 5
 6   STATE OF GEORGIA              *
 7      VS.                        *    13-W-11467 & 14-W-625
 8   JUAN ENRIQUE PEREZ            *
 9
10
11      PROBABLE CAUSE HEARING IN THE ABOVE-STYLED CASE, HELD
12   BEFORE THE HONORABLE JUDGE FRANK R. COX, ON THE 4TH DAY OF
13   MARCH, 2014.
14
15
16   APPEARANCE OF COUNSEL:
17        FOR THE STATE:              KEVIN BARGER
18        FOR THE DEFENDANT:          CARLOS J. RODRIGUEZ
19
20
21   ROBERT G. HALVORSON
22   COURT REPORTER
23   P.O. BOX 1559
24   MARIETTA, GEORGIA 30061
25   (770) 528-8937
```

```
 1  OF YOUR INVESTIGATION CONCERNING THESE TWO INCIDENTS THAT THE
 2  JUDGE JUST REVIEWED IN THE WARRANT?
 3       A    ON AUGUST 15, 2012, THE COBB COUNTY POLICE DEPARTMENT
 4  RECEIVED A DFCS REPORT, REFERENCE A CHILD MOLESTATION CASE.
 5  THE DFCS REFERRAL STATED THAT A FOUR-YEAR-OLD FEMALE HAD
 6  DISCLOSED THAT SHE HAD BEEN SEXUALLY ABUSED.  THE DFCS REFERRAL
 7  WAS MADE BY MEDLIN TREATMENT CENTER.
 8            ON SEPTEMBER 14, 2012, THAT INVESTIGATION WAS PLACED
 9  ON INACTIVE STATUS.  ON DECEMBER 13, 2013, AMANDA PEREZ, THE
10  MOTHER OF GISELLE PEREZ, THE ALLEGED VICTIM, CONTACTED THE COBB
11  COUNTY POLICE DEPARTMENT AND ASKED OR INQUIRED ABOUT HER
12  DAUGHTER'S CASE THAT HAD BEEN PLACED INACTIVE.
13            SERGEANT POLUSSO SPOKE TO MS. PEREZ ABOUT THE CASE.
14  SHE TOLD SERGEANT POLUSSO THAT HER DAUGHTER HAD CONTINUED TO
15  MAKE CONSISTENT STATEMENTS IN THERAPY WHILE AT MEDLIN TREATMENT
16  CENTER.
17            THE CASE WAS GIVEN TO ME.  I REVIEWED ALL
18  DOCUMENTATION FOR THAT CASE, AND DETERMINED THAT WITH
19  ADDITIONAL INFORMATION, THAT THE CASE NEEDED TO BE OPENED.  ON
20  MAY 9, 2014, I INTERVIEWED DR. GIFFORD.
21            THE COURT:  YOU SAID 2014.
22            THE WITNESS:  2014, JANUARY.
23            THE COURT:  MAY 9, 2014?
24            THE WITNESS:  JANUARY 9TH.
25            THE COURT:  I THOUGHT YOU SAID MAY.
```

```
 1        THE WITNESS:  OKAY.
 2        ON JANUARY 9, 2014, DR. ASIA GIFFORD WAS INTERVIEWED.
 3   SHE ADVISED THAT SHE HAD BEEN SEEING GISELLE PEREZ SINCE
 4   AUGUST 2012, AND ACTUALLY IS CURRENTLY SEEING HER.  DR.
 5   GIFFORD SAID THE FIRST FEW SESSIONS WITH GISELLE, THAT SHE
 6   DID DISCLOSE THAT SHE HAD SAT ON HER FATHER'S FACE WHILE
 7   NAKED, AND HE HAD LICKED HER BUTT; SPECIFICALLY, THE
 8   INSIDE OF HER BUTT.
 9        DR. GIFFORD STATED FROM THAT AUGUST 2012, UNTIL
10   OCTOBER 2012, SHE WAS CONSISTENT WITH THAT DISCLOSURE.
11   AFTER REVIEWING ALL DR. GIFFORD'S NOTES BETWEEN AUGUST
12   2012, UNTIL A CURRENT SESSION, 2014, I DETERMINED THAT
13   GISELLE PEREZ WAS SEXUALLY ABUSED.  THAT'S WHY I TOOK THE
14   TWO WARRANTS OUT.
15   Q    (BY MR. BARGER) AND THE TWO ADDRESSES, WERE THEY
16   RESIDENCES, OR HOW DID THEY FIGURE IN?
17   A    I BELIEVE THE 3575 GARRARDS CROSSING, ROSWELL,
18   GEORGIA, FROM FEBRUARY 2012, TO APRIL, HE HAD RENTED A ROOM.  I
19   SPOKE TO THE OWNER OF THAT HOUSE, JENNIFER HAMM, AND SHE DID
20   CONFIRM THAT HE DID RENT A ROOM THERE.  AND THE OTHER ADDRESS,
21   4019 COYTE COURT, IN MARIETTA, ALSO, FROM MAY OF 2012 TO
22   NOVEMBER 2012.
23   Q    AND BOTH OF THOSE ADDRESSES ARE IN COBB COUNTY?
24   A    YES.
25   Q    AMANDA PEREZ, THE MOTHER OF THE VICTIM, IS IT YOUR
```

6

1   A   YES.

2   Q   IS THIS THE SAME MEDLIN REPORT OF GISELLE PEREZ, DONE

3   BY DR. LERAY WILLIAMS, ON AUGUST 15, 2012?

4   A   YES.

5   Q   OKAY.

6       I WANT TO DRAW YOUR ATTENTION TO THE VERY BOTTOM OF

7   PAGE FOUR IN THE EVALUATION.

8   A   OKAY.

9   Q   ISN'T IT TRUE THAT WHEN GISELLE MADE THIS DISCLOSURE

10  ABOUT MR. PEREZ LICKING HER BOTTOM, THAT SHE IMMEDIATELY

11  STATED, I CHANGE MY MIND, SUGGESTING THAT THIS STATEMENT WAS

12  NOT TRUE?

13  A   YES.  IF THAT'S WHAT'S IN THE REPORT, YES.

14  Q   CORRECT.

15      AND YOU TESTIFIED ON DIRECT THAT THE CHILD'S

16  DISCLOSURE HAD BEEN CONSISTENT THROUGHOUT THE INVESTIGATION OF

17  DETECTIVE CAROL LARGENT.

18  A   DR. GIFFORD NOTED IN HER SESSIONS THAT THE CHILD WAS

19  CONSISTENT WITH WHAT SHE DISCLOSED TO DR. WILLIAMS.

20  Q   THE CHILD BASICALLY RECANTED, SAID THAT THAT'S NOT

21  TRUE.  SUGGESTED THAT WHAT SHE HAD DISCLOSED WAS NOT TRUE.

22      MR. BARGER:  I'M GOING TO OBJECT.  I DON'T THINK THAT

23  QUESTION PROPERLY CHARACTERIZES WHAT THE REPORT SAYS.

24      THE COURT:  AND THE WAY YOU PHRASE THAT QUESTION,

25  WHICHEVER WAY HE WOULD ANSWER, I STILL WOULDN'T KNOW WHAT

```
 1        A    YES.

 2        Q    AND SHE INTERVIEWED MR. PEREZ, CORRECT?

 3        A    YES.

 4        Q    AND HE WAS NOT IN CUSTODY?

 5        A    NO.

 6        Q    AND YOU'RE AWARE THAT DETECTIVE LARGENT INTERVIEWED
 7   OR SPOKE WITH MS. RAMONA JOHNSON, SHE'S THE DFCS CASE WORKER
 8   THAT WAS ORIGINALLY ON THE CASE?

 9        A    I BELIEVE SO.  IN THE REPORT, YES.  IF THAT'S IN THE
10   REPORT, YES.

11        Q    AND YOU'RE AWARE THAT DETECTIVE LARGENT INTERVIEWED
12   AMANDA PEREZ'S SISTER?

13        A    YES.

14        Q    ALL RIGHT.

15             SO YOU'RE AWARE THAT IN THAT RECORDED INTERVIEW, I
16   BELIEVE HER NAME IS MS. MORALES, SHE EXPLAINED TO DETECTIVE
17   LARGENT THAT HER CHILD HAD BEEN UNDER THE CARE OF MR. JUAN
18   PEREZ AS WELL, ON CERTAIN OCCASIONS?

19        A    YES.

20        Q    OKAY.

21             AND THAT SHE HAD ABSOLUTELY NO REASON TO BELIEVE,
22   WHATSOEVER, THAT THESE DISCLOSURES WERE TRUE?

23        A    CORRECT.

24        Q    OKAY.

25             SHE, IN FACT, CHARACTERIZED THESE DISCLOSURES AS
```

```
 1  RIDICULOUS, ISN'T THAT CORRECT?
 2          THE COURT:  DOES IT MATTER?  OBVIOUSLY, SHE DIDN'T
 3  DISAGREE.  DOES IT MATTER IF WE FIND THE WORD RIDICULOUS
 4  OR NOT?
 5          MR. RODRIGUEZ:  I'D LIKE FOR YOUR HONOR TO TAKE
 6  JUDICIAL NOTICE THAT THAT WAS THE DESCRIPTION OF THE
 7  RECORDED INTERVIEW OF MS. MORALES.
 8          THE COURT:  WELL, I'LL TAKE JUDICIAL NOTICE OF IT,
 9  BUT I DON'T KNOW HOW PERSUASIVE ANY LAY PERSON'S OPINION
10  IS, BUT I'LL TAKE JUDICIAL NOTICE OF IT.
11          MR. RODRIGUEZ:  WE'RE GOING TO GET TO DETECTIVE
12  LARGENT'S OPINION OF THIS, JUDGE.
13          THE WITNESS:  COULD YOU REPHRASE THE QUESTION,
14  PLEASE?
15          MR. RODRIGUEZ:  YES.
16      Q   (BY MR. RODRIGUEZ) ISN'T IT TRUE THAT IN REVIEWING
17  DETECTIVE LARGENT'S INVESTIGATION AND HER INTERVIEW, THAT MS.
18  MORALES, AMANDA PEREZ'S SISTER, DESCRIBED THE DISCLOSURE, THE
19  ALLEGATIONS, AS RIDICULOUS?
20      A   YES.
21      Q   SHE EXPLAINED TO, AND THIS IS MS. MORALES, EXPLAINED
22  TO DETECTIVE LARGENT, AND YOU'RE AWARE OF THIS, THAT THESE
23  ALLEGATIONS WERE FUELED BY MS. AMANDA PEREZ AND THE
24  GRANDMOTHER, ADA PEREZ?
25      A   I DON'T KNOW.
```

1            THE COURT: YES, SIR.

2       Q    (BY MR. RODRIGUEZ) DETECTIVE BASTIS, YOU TESTIFIED

3  THAT HER -- GISELLE'S STATEMENTS HAVE BEEN CONSISTENT

4  THROUGHOUT THIS TREATMENT WITH HER ORIGINAL DISCLOSURE IN

5  AUGUST OF 2012.

6       A    CORRECT.

7       Q    I'M GOING TO ASK YOU TO LOOK AT PAGE FIVE OF HER

8  EVALUATION; AND YOU'VE REVIEWED THIS BEFORE, CORRECT?

9       A    YES.

10      Q    SO YOU'RE AWARE THAT GISELLE DENIED THAT ANYONE ELSE,

11 INCLUDING HER FATHER, TOUCHED HER ON ANY OF HER -- ON ANY OTHER

12 PRIVATE PARTS?

13      A    CORRECT.

14      Q    OKAY.

15           SHE DENIED THAT ANYONE ASKED OR FORCED HER TO TOUCH

16 THEIR PRIVATE PARTS?

17      A    CORRECT.

18      Q    OKAY.

19           SO IS IT YOUR TESTIMONY THAT SHE HAS CONSISTENTLY --

20           MR. BARGER: YOUR HONOR, I'M GOING TO CONTINUE TO

21      OBJECT. THE QUESTION KEEPS -- WE KEEP COMING BACK TO THIS

22      MATTER OF CONSISTENCY. THE WITNESS'S TESTIMONY IS THAT

23      DR. GIFFORD'S INFORMATION IS THAT, TO DR. GIFFORD, THE

24      CHILD'S OUTCRY HAS BEEN CONSISTENT AND THE DESCRIPTION OF

25      EVENTS HAS BEEN CONSISTENT. HE HAS NEVER TESTIFIED THAT

```
 1        Q    OKAY.
 2             AND SHE HAD AN OPPORTUNITY TO ACTUALLY OBSERVE HER
 3   CHILD UNDER THE CARE OF MR. JUAN PEREZ?
 4        A    IT JUST STATES THAT HE HAS WATCHED HER DAUGHTER ON
 5   TWO OCCASIONS.  THAT'S ALL IT SAYS.
 6        Q    OKAY.
 7             ISN'T IT TRUE THAT BASED ON THIS INTERVIEW, THAT MS.
 8   MORALES ATTRIBUTED THESE ALLEGATIONS BY THE MOTHER AND
 9   GRANDMOTHER AS ESSENTIALLY THEM BEING VINDICTIVE?
10        A    I BELIEVE IT MENTIONS MONEY.
11        Q    THEY WERE ASKING --
12        A    SHE STATED THAT IT WAS ABOUT MONEY, NOT THEM BEING
13   VINDICTIVE.
14             THE COURT:  WHO IS SHE THAT SAID THIS?
15             THE WITNESS:  MS. MORALES.
16             THE COURT:  THE MOTHER?
17             THE WITNESS:  THE MOTHER'S SISTER.
18             THE COURT:  THE MOTHER'S SISTER CLAIMED THIS WAS
19        ABOUT MONEY.
20             THE WITNESS:  UH-HUH (AFFIRMATIVE.)
21        Q    (BY MR. RODRIGUEZ) AND THIS IS THE MOM'S SISTER, JUST
22   TO BE CLEAR, CORRECT?
23        A    THAT'S MY UNDERSTANDING.
24        Q    OKAY.
25             AND WHY DIDN'T YOU TAKE A WARRANT FOR HIS ARREST ON
```

1  SOMETHING THERE, BUT YOU INACTIVATE THAT CASE BECAUSE THAT
2  CHILD HAS NOT COMPLETED A COURSE OF THERAPY RECOMMENDED BY
3  MEDLIN. SO, YOU INACTIVATE THAT CASE PENDING FURTHER
4  INFORMATION FROM THE THERAPY SOURCE.
5      Q    SO YOU'RE LOOKING FOR SOME SORT OF CONTACT
6  COMMUNICATION FROM THE THERAPIST, CORRECT?
7      A    IF THE CHILD CONTINUED TO DISCLOSE IN A CONSISTENT
8  MANNER, AND THAT COURSE OF THERAPY WAS COMPLETED, OR THE
9  THERAPIST FELT LIKE THERE WAS A NEED TO CONTACT US, YES. THE
10 THERAPIST IS REQUIRED BY LAW TO CONTACT US, WHICH IS WHAT
11 TYPICALLY WOULD HAPPEN.
12     Q    DID YOU HAVE ANY CONTACT WITH RAMONA JOHNSON FROM
13 DFCS, IN THIS CASE?
14     A    I DON'T RECALL, BUT THAT'S POSSIBLE.
15     Q    THAT'S POSSIBLE, OKAY.
16          WERE YOU FAMILIAR WITH A DFCS CASE PLAN THAT WAS
17 CREATED IN AUGUST OF 2012?
18     A    NO.
19     Q    WERE YOU FAMILIAR WITH A DFCS CASE PLAN THAT WAS
20 CREATED IN OCTOBER OF 2012?
21     A    NO.
22     Q    DID YOU HAVE AN OPPORTUNITY TO SPEAK WITH DETECTIVE
23 BASTIS LAST WEEK, AFTER YOU WERE SERVED WITH THIS SUBPOENA FROM
24 MY INVESTIGATOR?
25     A    YES.

```
 1              DO YOU REMEMBER HOW MANY TIMES YOU SPOKE WITH
 2   DETECTIVE CAROL LARGENT ABOUT THIS CASE?
 3        A    MAYBE TWO OR THREE TIMES.
 4        Q    OKAY.
 5              DID DFCS CLOSE THEIR INVESTIGATION?
 6        A    YES, WE DID.
 7        Q    AND WHEN DID THAT HAPPEN?
 8        A    BETWEEN SEPTEMBER, OCTOBER OF 2012.
 9        Q    WHY DID THAT HAPPEN?
10        A    AFTER EVERYTHING HAD TAKEN PLACE, THE CHILD'S
11   INTERVIEWS, MEDICAL EXAMINATIONS, BIOLOGICAL MOTHER, YOU KNOW,
12   WAS PROTECTIVE, CHILD WAS IN THERAPY.  THERE WAS NOTHING
13   FURTHER THAT, YOU KNOW, DFCS COULD DO AT THAT TIME.
14        Q    WHILE DFCS HAD AN OPEN CASE, WAS THE CHILD -- I KNOW
15   YOU DIDN'T INTERVIEW THE CHILD, BUT WAS THE CHILD INTERVIEWED
16   AT CHILDREN'S HOSPITAL?
17        A    I DON'T REMEMBER THE CHILD BEING INTERVIEWED AT
18   CHILDREN'S HOSPITAL.  I JUST REMEMBER THE CHILD BEING EXAMINED
19   AT CHILDREN'S HOSPITAL.
20        Q    SHE WAS EXAMINED AT CHILDREN'S, OKAY.
21              DO YOU KNOW IF DETECTIVE CAROL LARGENT WAS ASSIGNED
22   TO THE CASE AT THAT TIME THAT THE CHILD WAS EXAMINED?
23        A    YES, SHE WAS, AT THAT TIME.
24        Q    YOU REMEMBER THAT, OKAY.
25              DO YOU KNOW IF THE CHILD HAD BEEN ADMINISTERED A
```

```
 1  FORENSIC INTERVIEW WHILE DFCS HAD AN OPEN CASE?
 2       A    THAT'S CORRECT, YES.
 3       Q    OKAY.
 4            DO YOU KNOW WHO DID THAT?
 5       A    DETECTIVE LARGENT.
 6       Q    ALL RIGHT.
 7            HAVE YOU BEEN CONTACTED BY ANYONE AT - WELL, LET ME
 8  ASK YOU THIS.  WHILE DFCS HAD AN OPEN CASE REGARDING MR. PEREZ,
 9  DID YOU SPEAK WITH ANYONE AT MEDLIN?
10       A    YES, I DID.
11       Q    OKAY.
12            WHO?
13       A    DR. GIFFORD.
14       Q    DR. GIFFORD, OKAY.
15            DID YOU TAKE NOTES OF THAT CONVERSATION?
16       A    YES, I DID.
17       Q    OKAY.
18            HAVE YOU BEEN CONTACTED BY DR. GIFFORD SINCE CLOSING
19  THE DFCS CASE?
20       A    I HAVE NOT, NO.
21       Q    OKAY.
22            AND SPECIFICALLY, YOU HAVEN'T BEEN CONTACTED ABOUT
23  MR. PEREZ FROM DR. GIFFORD?
24       A    NO.
25       Q    HAVE YOU BEEN CONTACTED BY ANYONE FROM MEDLIN,
```

```
1    REGARDING MR. JUAN PEREZ, SINCE DFCS CLOSED THE CASE?
2         A    NO.  I HAVE NOT, NO.
3         Q    OKAY.  ALL RIGHT.
4              AND LOOKING AT YOUR SECOND GEORGIA SAFETY PLAN, WOULD
5    IT BE ACCURATE THAT THE DECISION TO CLOSE THE DFCS CASE WAS
6    BECAUSE THE CRIMINAL INVESTIGATION WAS CLOSED?
7         A    PARTIALLY, YES.  THAT'S PART OF THE REASON.
8         Q    IS THAT WHAT IS INDICATED IN YOUR SAFETY PLAN?
9         A    YES.
10        Q    ALL RIGHT.
11             MR. RODRIGUEZ:  JUDGE, THAT'S ALL I HAVE.
12             THE COURT:  ANY QUESTIONS, MR. BARGER?
13             MR. BARGER:  I HAVE NO QUESTIONS.
14             THE COURT:  YOU HAVE RESIGNED FROM DFCS, IS THAT
15        CORRECT?
16             THE WITNESS:  NO, SIR, I STILL WORK THERE.
17             THE COURT:  OH, YOU STILL WORK THERE?
18             THE WITNESS:  YES, YOUR HONOR, I DO.
19             THE COURT:  ALL RIGHT.
20             YOUR RESPONSIBILITY AND DUTY IS TO ENSURE THAT ANY
21        CHILD IN QUESTION HAS A SAFE ENVIRONMENT TO LIVE IN,
22        CORRECT?
23             THE WITNESS:  YES, THAT IS CORRECT.
24             THE COURT:  AND YOU HAVE NO INPUT OR CONCERNS, OTHER
25        THAN PROVIDING A SAFE ENVIRONMENT, AS FAR AS WHETHER OR IF
```